UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHARLES A. KIMBROUGH, JR.,

        Plaintiff,

v.                                          Case No. 08-CV-641

LIEUTENANT STUTLEEN,
CORRECTIONAL OFFICER MATTHEW FLANNERY,
CORRECTIONAL OFFICER DANIEL LEVESQUE,
and NURSE KATHY LEMENS,

        Defendants.

# ORDER

The plaintiff, Charles A. Kimbrough, Jr., filed this *pro se* civil rights complaint under 42 U.S.C. § 1983, and is proceeding on a claim that the defendants were deliberately indifferent to his serious medical needs on September 20, 2007. This matter comes before the court on the plaintiff's motion for an extension of time, as well as the defendants' motion for summary judgment.

On September 4, 2009, the plaintiff requested additional time to respond to the defendants' August 21, 2009 motion for summary judgment. The defendants did not oppose the extension, and the plaintiff's October 6, 2009 response brief will, therefore, be accepted as timely.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is required "if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a dispute that "might affect the outcome of the suit." *Id.*

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986), courts should act with caution in granting summary judgment, *Anderson*, 477 U.S. at 255. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. *Id.* at 248.

The moving party bears the initial burden of demonstrating that he is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323. Where the moving party seeks summary judgment on the ground that there is an absence of evidence to support the nonmoving party's case, the moving party may satisfy its initial burden simply by pointing out the absence of evidence. *Id.* at 325. Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id.* at 323-24. Neither party may rest on mere allegations or

denials in the pleadings, *Anderson*, 477 U.S. at 248, or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (1989). In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, it is "not required to draw every conceivable inference from the record – only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991).

**FACTS**

The plaintiff, Charles A. Kimbrough, is a Wisconsin state prisoner, incarcerated at the Green Bay Correctional Institution (GBCI). The four defendants were employed at GBCI by the Wisconsin Department of Corrections at all relevant times. Lieutenant Mark Stutleen supervises Correctional Officers Matthew Flannery and Daniel Levesque. Kathy Lemens is a Registered Nurse in the Health Services Unit (HSU).

On September 7, 2007, the plaintiff submitted a health service request, asking for medical attention for his shortness of breath, rapid heart beat, dizziness, numbness in his finger tips, and weight loss. On September 11, 2007, a nurse evaluated the plaintiff regarding his complaints, and she instructed him to eat meals, and increase both his water intake and rest. The nurse discussed her evaluation of the plaintiff with Dr. Richard Heidorn, who is employed as a physician at GBCI. Dr. Heidorn determined that the plaintiff's symptoms did not indicate any emergency

testing or treatment, and he ordered standard lab tests as well as weight checks and a follow-up visit.

On September 13, 2007, the plaintiff told a sergeant that he couldn't breathe and felt as if he was going to faint, and two nurses came to check on him. The plaintiff told the nurses that he had started his Ramadan fast that day, and that he had not eaten. The plaintiff was given a bag lunch and encouraged to eat, and told to notify HSU if his symptoms returned.

On September 20, 2007, defendant Levesque was assigned to assist Lemens in the group room with the collection of laboratory samples from inmates. Lemens drew a blood sample from the plaintiff based upon Dr. Heidorn's order for standard lab tests. Lemens and Levesque also told the plaintiff to provide a urine sample for testing, but when he came out of the restroom, he said that he had been unable to urinate. After about 30 minutes, Lemens had Levesque ask the plaintiff to try again, but he again returned with an empty cup. At Lemen's instruction, Levesque then told the plaintiff to go to the rotunda to drink water and wait until he could provide his sample. The plaintiff responded that he could not, and that he would return to his cell. When the plaintiff set down his empty sample cup and began to walk away, Levesque ordered him to come back, but the plaintiff disobeyed and left the group room without permission. Levesque then contacted Stutleen to report that the plaintiff had gone back to his cell without permission.

According to Lemens and Levesque, the plaintiff did not show any signs of physical distress, and they were not aware that he had any urgent health problems. However, the plaintiff maintains that he told Lemens and Levesque that he "needed to see Health Services Unit (HSU) for my medical problems." (Plaintiff's Affidavit, Docket #61 at 5). According to the plaintiff, he "was in a confusing state of mind" and "felt like he was going to black out," so he returned to his cell to lay down. *Id.* at 4. Inmate Andreze Talley avers that the plaintiff "looked very weak and very pale" while waiting to produce the urine sample, and that he heard the plaintiff "state that he was too weak to walk to the rotunda and that he felt as if he were going to faint." (Talley Affidavit, Docket #62 at 1).

After Levesque informed Stutleen that the plaintiff had disobeyed orders and left the group room without permission, Stutleen placed him on Temporary Lock-Up (TLU) status, anticipating the issuance of a conduct report for disobeying orders and leaving an assigned area. Stutleen then had the plaintiff escorted back to the group room, but the plaintiff again stated that he was unable to urinate, so Stutleen had Levesque and Flannery escort the plaintiff to the Receiving Unit, near the main HSU area, so that HSU staff could monitor him and obtain the laboratory samples needed for further testing.

According to Stutleen, the plaintiff walked under his own power, while Levesque and Flannery each held one arm, and, although the plaintiff briefly stopped and kneeled, he appeared to stand up on his own and continue walking. Stutleen

-5-

and Levesque state that the plaintiff did not show any signs of physical distress and did not appear to require immediate medical attention of any kind. However, the plaintiff maintains that he told Stutleen, Levesque, and Flannery "of my medical problems and asked them if we can stop and rest so I can catch my breath," but they would not allow him to rest, and Levesque and Flannery grabbed him tightly and forced him to walk without letting him catch his breath or getting him medical aid, and that his handcuffs cut into his wrist, causing it to bleed. (Plaintiff's Affidavit, Docket #61 at 6-7). Inmate Gregory Hoover avers that the plaintiff "appeared to be walking under the total control of the two correctional officers escorting him," and that the plaintiff was "doubled over in obvious pain and discomfort." (Hoover Affidavit, Docket #63 at 1-2). Inmate Devon Telfered avers that he overheard the plaintiff tell Stutleen, Flannery, and Levesque "that he was too weak to walk and that he needed a nurse." (Telfered Affidavit, Docket #64 at 2). The plaintiff states that he was placed in the receiving cell closest to the HSU and told to yell if he needed a nurse, but he "blacked out" and didn't see the doctor until the next day. (Plaintiff's Affidavit, Docket #61 at 7-8).

The next day, September 21, 2007, Dr. Heidorn received the plaintiff's lab test results, which showed that he suffered from profound anemia. Dr. Heidorn evaluated the plaintiff and sent him to the hospital the same day for a blood transfusion and further evaluation. The plaintiff remained at the hospital for five days, and it was determined that his anemia was likely caused by a Vitamin B-12

deficiency. The plaintiff received a blood transfusion and Vitamin B-12 injections, and was discharged with instructions to continue vitamin supplements and injections. After discharge from the hospital, Dr. Heidorn ordered the continuation of those vitamin supplements and injections, as well as updated lab work and an evaluation by a specialist. The plaintiff has responded well to his course of treatment and had not experienced any anemia or other health problems related to his B-12 deficiency since beginning this treatment.

## ANALYSIS

In support of summary judgment, the defendants offer that they were not deliberately indifferent to the plaintiff's serious medical condition on September 20, 2007. The defendants contend that they did not know about the plaintiff's medical condition on that date, and that the plaintiff did not suffer any injury as a result of their actions on that date. Specifically, the defendants argue that: it was impossible for them to know that the plaintiff was anemic until he provided specimens for analysis; that they took extraordinary care to ensure that his lab work was completed; and, that the plaintiff had a cumulative condition that progressed slowly over time, so he cannot show that he was injured by one day's delay in admitting him to the hospital for treatment.

In response, the plaintiff maintains that the defendants knew of his medical issues on September 20, 2007, because he asked for medical aid, yet they failed to send him to the health services unit and forced him to walk without allowing him to

-7-

catch his breath. He goes on to assert that, as a result, he "suffered paresthesia (nerve damage), a sensation like burning needles sticking him in his hands, legs, and feet" as well as "jaundice of the skin, pernicious anemia, black-outs, anorexia, and abnormal complete blood count (CBC), optical nerve damage, and pain in his legs, hands, and feet." (Plaintiff's Memorandum of Law Opposing Summary Judgment, Docket #60 at 10).

In reply, the defendants contend that the plaintiff failed to offer verifying medical evidence that he was harmed by the hours that passed while awaiting results from the lab work conducted on September 20, 2007, until he was seen by the prison physician and admitted to the hospital for treatment the following day.

The plaintiff claims that he was escorted roughly when he was feeling weak and unwell on September 20, 2007, and that he should have received immediate medical attention on that day, which was delayed until the following day while his lab work was completed. Even accepting the plaintiff's version of events, however, the defendants' allegedly rough and inconsiderate physical handling of the plaintiff does not state a constitutional claim, as "an inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins v. Gaddy*, 559 U.S. ___,130 S.Ct. 1175 (2010) (*per curiam*) (also stating that "not 'every malevolent touch by a prison guard gives rise to a federal cause of action.'") (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (*per curiam*). This leaves the plaintiff's claim that he was denied immediate medical aid on

-8-

Case 2:08-cv-00641-JPS   Filed 03/26/10   Page 8 of 11   Document 71

September 20, 2007, although he and other inmates aver that he looked unwell and requested medical assistance.

To establish liability under the Eighth Amendment for denial of medical care, a plaintiff "must demonstrate two elements: (1) an objectively serious medical condition; and (2) deliberate indifference by the prison officials to that condition." *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009) (citing *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)). A serious medical condition is one "that a physician has diagnosed as needing treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (internal quotation and citation omitted). Deliberate indifference "is a subjective standard" that requires "ignoring a known risk." *Johnson*, 444 F.3d at 585. In addition, if the claim is for a delay in providing medical care, then the plaintiff must provide "verifying medical evidence that shows his condition worsened because of the delay." *Knight*, 590 F.3d at 466.

Here, according to the plaintiff, he told the defendants that he wanted to see a nurse, and that he was too weak to walk, and they responded by pulling him along to a cell near the health services unit and telling him that he'd be able to yell for a nurse. If true, this would certainly be callous and possibly negligent. However, the plaintiff does not dispute that the defendants followed the doctor's directive to obtain his specimens for diagnostic lab testing, and he acknowledges that he was seen by the doctor the following day, and admitted to the hospital promptly after the doctor

received his lab test results.  The plaintiff does not allege that any of the defendants were aware that he "blacked out" in the cell overnight, or that he was injured or harmed when he "blacked out."  Thus, the plaintiff's account does not establish that the defendants ignored a known need for medical attention.  Rather, it shows that the defendants did not believe that the plaintiff's complaint of feeling weak constituted a medical emergency.  *See Knight*, 590 F.3d at 466 ("Their skepticism of complaints about shoulder pain by a petulant prisoner at a work camp does not constitute a violation of the Eighth Amendment.").

Furthermore, the plaintiff has not submitted any medical evidence showing that his condition worsened as a result of the one-day delay from the time the plaintiff complained to the defendants that he was feeling weak on September 20, 2007, until his lab results were processed and he was admitted to the hospital the following day.  The plaintiff claims that he suffered optical nerve damage, but the medical records he provides do not suggest that his eye problems are connected in any way to his B-12 deficiency or anemia, much less that they were caused by the defendants' actions.  *See Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007) ("[E]vidence of a plaintiff's diagnosis and treatment, standing alone, is insufficient if it does not assist the jury in determining whether a delay exacerbated the plaintiff's condition or otherwise harmed him.").  The plaintiff's conclusory assertions are inadequate to contest Dr. Heidorn's medical opinion that his eye problems are not related to his B-12 deficiency or the anemia he suffered in September 2007.  The

plaintiff lists various other symptoms that he suffered from, such as jaundice and numbness in his extremities, but nothing in the record casts doubt on Dr. Heidorn's medical opinion that the plaintiff's B-12 deficiency and related anemia was a cumulative condition that progressed slowly and did not deteriorate between September 20, 2007, and September 21, 2007. Therefore, the defendants' motion for summary judgment will be granted.

Accordingly,

**IT IS ORDERED** that the plaintiff's motion for extension of time (Docket #59) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment (Docket #49) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this case be and the same is hereby **DISMISSED**.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 26th day of March, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

-11-

Case 2:08-cv-00641-JPS   Filed 03/26/10   Page 11 of 11   Document 71